IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 22, 2019 Session

### JAMES F. LOGAN, JR., ET AL. v.
### THE ESTATE OF MILDRED CANNON ET AL.

**Appeal from the Chancery Court for Bradley County**
**No. 2011-CV-48      Frank V. Williams, III, Chancellor[1]**

_____

### No. E2018-02043-COA-R3-CV

_____

Upon remand from this Court in a previous appeal, the trial court conducted a bench trial on a claim of common law adverse possession initiated by the plaintiff concerning a one-quarter ownership interest in an unimproved 7.18-acre tract of real property located in Bradley County, Tennessee. In its final order, the trial court dismissed the plaintiff's action in its entirety upon finding that although the plaintiff had presented evidence that preponderated in favor of adverse possession, the evidence did not rise to the level of the clear and convincing standard required to establish ownership through adverse possession. The plaintiff has appealed. Having determined that the plaintiff demonstrated adverse possession of the property interest at issue by clear and convincing evidence, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

James F. Logan, Jr., Cleveland, Tennessee, Pro Se.

Travis D. Henry, Cleveland, Tennessee, for the appellees, The Estate of Mildred Cannon by and through the Personal Representative, Janna Sullivan; Janna Cannon Sullivan, Individually; Janna Cannon Sullivan as Co-Trustee; and Comerica Bank, Successor Co-Trustee, per the Will of Sam Cannon.

_____

[1] Sitting by interchange.

**OPINION**

**I. Factual and Procedural Background**

This case was previously before this Court on appeal in *Logan v. Estate of Cannon*, No. E2015-02254-COA-R3-CV, 2016 WL 5344526 (Tenn. Ct. App. Sept. 23, 2016) ("*Logan I*"). At issue is a one-quarter ownership interest ("Disputed Interest") claimed by the plaintiff, attorney James F. Logan, Jr., in an unimproved 7.18-acre tract of real property located at the intersection of Mouse Creek Valley Road and Lauderdale Highway in Bradley County, Tennessee ("the Property"). In *Logan I*, this Court affirmed the trial court's grant of summary judgment to the defendants on all claims except Mr. Logan's claim of common law adverse possession, determining that genuine issues of material fact existed concerning adverse possession and remanding the case for "further proceedings concerning this claim." *Id.* at *1.

In *Logan I*, this Court set forth the factual and procedural background leading to the first appeal as follows:

> Prior to the alleged April 1974 conveyance of a one-quarter interest in the Property ("Disputed Interest") from Sam and Mildred Cannon to Mr. Logan, the Property was owned in equal percentages by Mr. Cannon, James S. Thompson, Conrad Finnell, and C.W. Wright, Jr. At the time, Mr. Thompson, Mr. Finnell, and Mr. Logan were all partners in the law firm now known as Logan-Thompson, PC.
>
> The chain of title reflects that on October 6, 1967, a conveyance of the Property via warranty deed from H. L. Hughes, Jr., et ux., in equal fourths to Mr. Cannon, Mr. Wright, and Joan W. Walker, with the remaining one-fourth divided equally between Mr. Thompson and Mr. Finnell, was recorded in the Bradley County Register's Office. Through various recorded conveyances of portions of interest in the Property, by April 1972, the Property was jointly owned by Mr. Wright, Mr. Thompson, Mr. Finnell, and Mr. Cannon as tenants in common. Mr. Cannon's interest was one-twelfth shy of a one-fourth interest in the Property. On December 22, 1972, Mr. Thompson and Mr. Finnell conveyed to Mr. Cannon by warranty deed a one-twelfth interest in the Property. However, this deed was not recorded until 1979 and, according to Mr. Thompson's affidavit, was believed lost. On March 16, 1974, Mr. Thompson and Mr. Finnell again conveyed by warranty deed the same one-twelfth interest in the Property to Mr. Cannon. This deed was recorded on March 21, 1974. It is undisputed that the recorded chain of title concerning the Disputed Interest

2

ends with the 1979 recordation of the 1972 deed conveying to Mr. Cannon a one-twelfth interest in the Property.

Mr. Logan's claim rests on his assertion that in April 1974, Mr. Cannon was having financial problems, offered to sell Mr. Logan the Disputed Interest, and accepted a check written by Mr. Logan in the amount of $6,400.00 as full payment. Mr. Logan acknowledges that the cancelled check has long since been lost or destroyed. Mr. Logan maintains that prior to purchasing the Disputed Interest, he confirmed with Mildred Cannon that she agreed to the sale. Mr. Logan testified through deposition that he believed Mr. Cannon was going to have Mr. Thompson draft a deed. According to Mr. Logan, he discovered there was no deed of record for his ownership of the Disputed Interest in 2006 or 2007 when he and other co-tenants were preparing to apply for permission to rezone the Property for development.

Meanwhile, Sam and Mildred Cannon were divorced in 1979. Two children, now adults, were born to the marriage: co-defendant Janna Cannon Sullivan and Phil Cannon. The divorce judgment and concomitant agreed property settlement, attached to pleadings in the record before us, provides for no distribution of the Disputed Interest. It is undisputed that upon Mr. Cannon's death in 2002, his estate was settled without reference to his purported interest in the Property.

On February 28, 2011, Mr. Logan, Mr. Thompson, and Jenny Rogers (collectively, "Plaintiffs") filed this action seeking declaratory judgment regarding ownership of the Disputed Interest and clear title in Mr. Logan's name to the Disputed Interest. Ms. [Jenny] Rogers is the daughter and successor in interest of Conrad Finnell, who had died on April 14, 2003. The plaintiffs named as defendants Mildred Cannon; Janna Cannon Sullivan, individually and as co-trustee of a trust for the benefit of Phil Cannon; and Comerica Bank, successor co-trustee pursuant to the will of Sam Cannon (collectively, "Defendants"). Mildred Cannon subsequently died during the pendency of this action on September 7, 2011. Thereafter, the Estate of Mildred Cannon, by and through Janna Cannon Sullivan as personal representative, was substituted for Mildred Cannon as co-defendant.

Although Plaintiffs averred in their complaint that Mr. Logan's purported purchase of the Disputed Interest should be upheld, they also claimed in the alternative that Mr. Logan had acquired the Disputed Interest

via adverse possession. Plaintiffs sought to have the trial court (1) compel Defendants to execute a deed to replace the purportedly lost deed, (2) declare the purportedly lost deed valid, and (3) declare Mr. Logan the true owner of the Disputed Interest.

Defendants filed an answer on May 4, 2011, denying any knowledge of a conveyance of the Disputed Interest from Sam and Mildred Cannon to Mr. Logan and asserting, *inter alia*, the Statute of Frauds as an affirmative defense. *See* Tenn. Code Ann. § 29-2-101. On November 1, 2011, Defendants filed a motion for summary judgment, requesting dismissal of the complaint. In support, they attached a statement of material facts, a memorandum of law, a copy of Mr. Logan's response to the Defendants' first set of interrogatories, and a copy of Mr. Logan's deposition testimony. They subsequently filed affidavits completed respectively by Ms. Sullivan and the Bradley County Assessor of Property, who stated that Mr. Logan's name was not added to the tax assessment for the Property until 2009.

Plaintiffs subsequently filed their motion for summary judgment on June 22, 2012, asserting that Mr. Logan's 1974 purchase of the Disputed Interest was "undisputed" and that no genuine issue of material fact existed to prevent an award of summary judgment in favor of Plaintiffs. In support, they attached a statement of "undisputed" material facts and several affidavits attesting to Mr. Logan's purchase of the Disputed Interest, his payment of one-quarter of the property taxes on the Property since 1974, and/or his use of and control over the Property since April 1974. They also attached the affidavit of the Bradley County Trustee, who attested to tax records reflecting that Mr. Logan paid one-quarter of the property taxes related to the Property from 1996 through 2010. Plaintiffs subsequently filed a motion to amend the complaint to plead the equitable doctrines of constructive and/or resulting trust.

The trial court conducted a hearing on April 2, 2013. Finding that Plaintiffs had failed to satisfy the requirements of the Statute of Frauds or to prove that Mr. Logan's use of the Property constituted adverse possession, the court granted summary judgment in favor of Defendants and quieted title of the Disputed Interest in favor of Defendants. The court entered a final order to this effect on March 4, 2014, incorporating a memorandum opinion from the April 2, 2013 hearing. Mr. Logan timely appealed to this Court.

This Court remanded the case on March 24, 2014, however, requesting clarification concerning Mr. Logan's motion to amend his complaint and his claims of resulting trust and/or constructive trust. Following a hearing on remand, the trial court granted Mr. Logan's motion to amend his complaint but confirmed summary judgment in favor of Defendants, dismissing Mr. Logan's claims of resulting trust and constructive trust. The trial court entered a final judgment to this effect on October 28, 2015. Mr. Logan timely appealed.

*Id.* at *1-3 (footnotes omitted). Mr. Logan was the sole plaintiff to participate in the first appeal, *id.* at *1, and he is also the sole plaintiff to participate in the instant appeal. As in the first appeal, *id.* at *2, the defendants are the Estate of Mildred Cannon; Janna Cannon Sullivan, individually and as co-trustee of a trust for the benefit of Phil Cannon; and Comerica Bank, successor co-trustee pursuant to the will of Sam Cannon (collectively, "Defendants").

In determining that summary judgment was not proper on the issue of common law adverse possession, this Court concluded that genuine issues of material fact existed concerning whether "Mr. Logan [had] maintained control of the Disputed Interest in the Property and, if so, whether Defendants had knowledge of his adverse possession or whether such adverse possession was so open and notorious in the community as to imply a presumption of that fact." *Id.* at *14. Noting the content of affidavits presented by Mr. Logan with his motion for summary judgment, this Court stated that "[t]he majority of Mr. Logan's potential witnesses thus submitted sworn statements that Mr. Logan was the individual whom people routinely contacted regarding information about or use of the Property, and they also maintained that he was generally known in the community to be the owner of the Disputed Interest." *Id.* at *11. Also noting conflicting affidavits concerning whether Mr. Logan had paid real property taxes on the Disputed Interest prior to 2009, this Court also concluded that "[a] genuine issue of material fact . . . exist[ed] regarding whether Mr. Logan demonstrated his intent to claim the Disputed Interest by paying property taxes on it from at least 1991, twenty years prior to filing the complaint." *Id.* at *14.

Following remand, the trial court conducted a bench trial on July 19, 2018. Evidence presented by Mr. Logan included, in addition to various exhibits, his own testimony and testimony proffered by James S. Thompson (testifying telephonically), Mr. Logan's law partner and a tenant in common owning one-fourth interest in the Property; Arnold E. Botts, a former employee of Mr. Logan's law firm; H. L. Hughes, III, a farmer who had grazed cattle on the Property; and Cynthia A. Logan, Mr. Logan's wife. Presenting his own testimony on direct exam, Mr. Logan reiterated his account, as noted in *Logan I*, 2016 WL 5344526, at *2, of his purported 1974 payment to Sam Cannon of

5

$6,400.00 in exchange for the Disputed Interest and subsequent failure to obtain a deed documenting the conveyance, which he did not discover until 2006 or 2007.

Mr. Logan stated that when he and Mr. Cannon were discussing the sale of the Disputed Interest, Mr. Cannon took Mr. Logan to the Property and "pointed out the fences which were there." Mr. Logan continued his testimony as follows in pertinent part:

> Mr. Hughes and his son . . . were actually repairing a fence which was located along Mouse Creek Valley Road and for some reason the fencing needed repair. There was a fence which was somewhat dilapidated along the roadway on Mouse Creek Valley Road and along the roadway of Lauderdale Highway.
>
> There was a lock on the gate which was located, my estimate is approximately 100 feet . . . . That fence had weak points in it and problems developed over the years.
>
> We shook hands. I got a key to the lock on the gate. The only entrance way there was to the property at that time was through the property of Mr. Broaddus who was a gentleman from Georgia. I had spoken to him over the years. He passed away several years ago. I do not know the exact date. That property of Mr. Broaddus's was purchased by Mr. Robert Wright about seven years ago, eight years ago, maybe a little longer than that.
>
> I exercised complete control over the use of that property since 1974. I pronounced openly to the entire world through the offices of the assessors of property, through the offices of the planning commission, through discussions with county commissioners, through discussions with the property owners of adjoining tracts of land who acknowledged my complete control of that property and the right of use of that property from and after 1974 . . . .
>
> * * *
>
> I stopped by the property. It is true it was not a daily occurrence but I drove past that property. On many occasions I would go Mouse Creek Valley Road or come back from Athens, Tennessee or otherwise and check on the property. There were numerous occasions in which I ascertained

that the property was not secure and I would personally come back to the property or if I was attired appropriately I would secure the property.

I kept a hammer in the trunk of my vehicle, as I have in the trunk of my vehicle today a tool kit small as it is, and would repair the fencing or go to Mr. Hughes, H. L., III or H. L., Jr., and tell them for them to continue to use the property that they would have to abide their responsibility of keeping the property. They responded to my direction throughout the time period until Mr. [H. L.] Hughes [senior], passed away and then Hughesy [H. L. Hughes, III,] moved.

After that occurred, as a part of all that . . . there was one time when there was a lock that I did not have the key to. I went -- my wife and I, the following day or two days following that, went up there and I bought bolt cutters and cut that lock, placed another lock to the key, to Mr. Hughes and retained a key for myself. There's not one time that I'm aware of that anybody ever failed to recognize my control over this property. Not once.

I did discuss it with the planning office. At that time the restrictions and state law regarding the placement of package liquor stores was controlled by populations of the municipality. I even discussed a bill to amend or modify that so that I could then use that property and discussed it with the city commissioner of the City of Charleston and the city manager of the City of Charleston to see if they would -- they wanted some revenue and they even considered it with reference to allowing it if they could qualify with the population level.

* * *

Robert Wright communicated with me and wanted to purchase this property. He did it through Mr. James S. Thompson who was representing him in a proceeding and he, Mr. Thompson, referred him to me to make those decisions. I told him that we were not in a position to sell the property at that time, that we anticipated substantial development.

We have kept a cooperating relationship because across the road there at the Wright Brothers Construction Company in order to develop a -- I developed a plan to utilize how we could utilize this property commercially. It would require the construction of a deceleration lane on Mouse Creek Valley Road commencing at a point which would be north of the former gate.

Went over this plan both with the road department and with the planning office. It would require an acceleration lane to be constructed onto Lauderdale Highway if there were commercial development with an entrance way into the subject property. During the course of this time we've developed plans to land lease the property if we were able to do the development of this property.

* * *

I have entertained and shown the property to various entities including the Pilot Oil Company land purchase officer and they looked at the property, chose not to make a formal offer for the property and purchased the property located at Exit 20 which is 13 miles, 15 miles south of this property on 1-75. There are other entities there with reference to that.

And all of those discussions have taken place solely and alone with me . . . .

Now, we have changed the entire fencing of this property. The difficulty of placing the fence is that it actually was located very close to, if not on the boundary, of the Mouse Creek Valley Road. That was moved back when I allowed Wright Brothers on behalf of myself and Mr. Wright, Mr. Robert Wright, who purchased the Broaddus property, and he asked me if he could continue to use the property as it had been used. He asked my permission because he knew I was in control of that property.

* * *

We have taken the gate down which was located on Mouse Creek Valley Road, put up fencing and extended it and allowed the utilization of a gate to be placed which the corner closest to . . . Lauderdale Highway in which forms the property line between the Broaddus property purchased by Robert [Wright], allowed him to put the fence to that at that point. We took the gate out on Mouse Creek Valley Road and then placed the new gate. Mr. Wright actually placed that gate there.

* * *

8

There are times over that period of time in which the fencing was covered in undergrowth. I would go by and get Mr. Hughes to clean it. There are times when I have actually cleaned the fence row myself. There are portions of the fence row.

I've shown the property and talked to approximately -- there are in excess of five but I cannot recall how many people. . . .

Though this property is farmland and has been utilized for that purpose no one was allowed on that property without my permission . . . .

On cross-examination, Mr. Logan acknowledged that the original fence did not enclose the entire 7.18-acre parcel at issue and that at the time of trial, the Property was still open to the adjoining Wright property. Mr. Logan testified that Robert Wright had grazed his cattle on the Property with Mr. Logan's permission and obtained permission from Mr. Logan to have employees of Wright Brothers build a new fence in the last three to five years prior to trial. Mr. Logan also testified that the Wrights had approached him in the past about purchasing the Property.

Mr. Logan acknowledged that the tax assessor's records did not change the owner from Sam Cannon to Mr. Logan until approximately 2008. He also acknowledged that when Yvonne Cannon executed a quitclaim deed conveying any interest she had in the Disputed Interest to Mr. Logan, Yvonne Cannon, as Sam Cannon's second wife, was not a titled owner of the Property.

Mr. Botts testified that he had been employed as an investigator for Logan-Thompson, P.C. ("Logan-Thompson") from 1994 through 2014 when he resigned to accept another position. He explained that he had also been employed as an investigator in the past by Defendants' counsel's law firm. Mr. Botts described an incident that occurred when he was present in Mr. Logan's office and overheard a conversation via speakerphone between Mr. Logan and Mildred Cannon around the time that Mr. Logan had realized that a deed conveying the Disputed Interest to him had never been recorded. Mr. Botts testified that he had heard Mildred Cannon "acknowledge[] that it was her recollection that this property was sold to . . . Mr. Logan." When questioned regarding whether he had overheard any discussion concerning the prior execution of a deed conveying Mildred Cannon's interest to Mr. Logan, Mr. Botts responded: "There was discussion regarding that she thought that it occurred but could not find that deed." Mr. Botts stated that he subsequently delivered an unsigned deed, dated for the year 2007, to Mildred Cannon and that "she wanted some time to look at it." Mr. Botts acknowledged that Mildred Cannon never executed the deed.

9

Mr. Botts testified that he had been present during conversations among Mr. Logan and the owners of the other three-quarters interest concerning the Property. He stated that on occasion, he had delivered property tax payments for the Property on Mr. Logan's behalf to the county trustee's office. When questioned regarding whether "there was any hiding of the fact that Jim Logan was in control of this property," Mr. Botts stated: "No, sir. It was common knowledge there in the law firm and were occasions when [Mr. Logan] would direct me to check on the property while I was in the Charleston area." Mr. Botts explained that when he checked on the Property, "fencing was always of concern." Mr. Botts acknowledged that the instances when he checked on the Property were occasional but stated that he checked "more than once or twice a year" because he had to investigate traffic accidents in the area fairly regularly. Mr. Botts also acknowledged that he had never observed Mr. Logan physically on the Property.

Mr. Thompson testified that following the execution of several deeds, Conrad Finnell, Bill Wright, Sam Cannon, and he each owned a one-fourth interest in the Property in 1974. He stated that he remembered Sam and Mildred Cannon's selling their one-quarter interest in the Property to Mr. Logan in 1974 but that he could not remember whether Mr. Cannon ever specifically acknowledged to Mr. Thompson that the Disputed Interest had been sold to Mr. Logan. However, according to Mr. Thompson, "for the next 35 years Sam Cannon never showed any interest whatsoever in the property and [Mr. Logan was] the one that took over its interest and more or less ran the property." Concerning the management of the Property, Mr. Thompson stated:

> To the best of my knowledge no one but Mr. Logan took any responsibility over the management of that property. I know I never talked to anybody. Even if somebody was interested they would talk to [Mr. Logan] like Mr. Wright or the adjoining property owner on maintaining the fences. That was conversations [Mr. Logan] had. I did not have any and to the best of my knowledge, although many years have passed, I do not believe that Conrad [Finnell] or Bill Wright ever had any control or interest in terms of managing the property.

Mr. Thompson also testified that Mr. Logan was not required to consult with him regarding the management of the Property but that Mr. Logan would occasionally inform Mr. Thompson of what was being done on the Property.

Mr. Thompson further testified that Sam Cannon had been "an exceptionally good friend" and that when they were together socially, Mr. Cannon never demonstrated any interest in the Property after Mr. Logan purportedly purchased the Disputed Interest. Mr. Thompson stated that during the years between the alleged 1974 purchase and Mr. Cannon's death in 2002, it was Mr. Thompson's understanding that Mr. Cannon had sold

10

the Disputed Interest to Mr. Logan and that Mr. Cannon was no longer a partner in the ownership of the Property. Mr. Thompson contrasted this situation with his partnership with Sam Cannon and other individuals in the ownership of three apartment complexes in which Mr. Cannon did take an active interest.

On cross-examination, Mr. Thompson acknowledged that he was a longtime friend and law partner of Mr. Logan's and that Mr. Thompson's son was also a law partner with their firm. He further acknowledged that he had been unable to find any deed conveying the Disputed Interest from Sam and Mildred Cannon to Mr. Logan. He testified that the only improvement on the Property had been fencing but stated that "it was necessary for Logan to arrange to have some gates repaired and things of that nature and the fields mowed and so on." Mr. Thompson acknowledged that some of the fencing was there when he and the other interest holders purchased the Property and that the Property had never had signs on it indicating that Mr. Logan owned any interest in the Property.

Mr. Hughes testified that when he was growing up, his father owned approximately 100 acres that included the Property. According to Mr. Hughes, his father then sold all of the 100 acres except for the Property to a man from Georgia named Mr. Broaddus. Mr. Hughes stated that he first met Mr. Logan and Mr. Cannon when Mr. Hughes and his father were building a fence along Mouse Creek Valley Road in a corner of the Property. Although Mr. Hughes remembered the year that he met Mr. Logan on the Property as approximately 1969, five years prior to Mr. Logan's purported purchase of the Disputed Interest, Mr. Hughes stated that he remembered overhearing Mr. Logan say on that day to Mr. Cannon that he was "glad [he] could help and [he]'ll take it" and seeing the two men shake hands. Mr. Hughes also testified that "[a]fter [Mr. Logan] bought it I knew [Mr. Logan] had a key" and that "if we happened to change the lock for some reason we brought [Mr. Logan] a key."

Mr. Hughes explained that after his father sold the bulk of the farm to Mr. Broaddus, the elder Mr. Hughes "had a lifetime use as long as he kept the property clean, the fences up and took care of it just like he had been taking care of it like it was his." As to the Property, Mr. Hughes testified that his father "had an agreement with [Mr. Logan] and when my daddy ended up in the hospital in pretty bad shape the Broaddus family called me – or their lawyer called me and asked me if I would like to keep the same agreement and I said, yes." Mr. Hughes further testified that at that point he contacted Mr. Logan and asked "if [he] could have the same agreement with [Mr. Logan] that [his] daddy had." According to Mr. Hughes, Mr. Logan responded by telling him that provided Mr. Hughes maintained the fences and kept the Property appearing clipped and clean, Mr. Hughes could continue to use the Property. Mr. Hughes described occasions when he would be "in the field mowing hay or cutting hay and Mr. Logan and his wife would stop by or they'd stop at the house and say, I've got a customer that wants to look

11

at this certain property. Would you mind clipping it for us." Mr. Hughes stated that he would then "go over and bush hog [the Property] and clean it up."

When questioned regarding whether Mr. Logan was well known in the community near the Property to have exercised control over the Property, Mr. Hughes stated:

> It was real well known in the community. I mean, the neighborhood all down below me knew [Mr. Logan] owned that property. Wright Brothers knew [Mr. Logan] owned the property. The lady that built the new filling station knew [Mr. Logan] owned the property because she was thinking about building another one down on there on the corner.

Mr. Hughes testified that he had given Mr. Logan's telephone number to an individual who expressed interest in purchasing the Property. When questioned regarding whether anyone who wanted to physically access the Property from 1975 to the present could do so without obtaining a key from Mr. Logan, Mr. Hughes answered that no one could.

Mr. Hughes acknowledged that the Property had never been fenced off from the total sixty acres upon which he regularly grazed twenty to thirty head of cattle. He testified that a new fence erected along Mouse Creek Valley Road, which includes the Property, was built by the Wright Brothers and that the only part of the old fence left in that section was a stretch "maybe ten feet long between two old trees." Mr. Hughes stated that he remembered an incident when the lock on the gate was changed, explaining that a survey crew member from a construction site across the road had mixed up the locks after coming to Mr. Hughes to borrow the key to the gate. He also stated that he remembered an occasion when he had spoken to Mr. Logan after the gate had been knocked down on the Property. Mr. Hughes testified that he knew only of Mr. Logan, the elder Mr. Hughes, and himself having had keys to the locked gate. As to "no trespassing" signs, Mr. Hughes stated that both Mr. Logan and he had erected the signs but that the signs were knocked down or disappeared. Mr. Hughes acknowledged that he had not known of the other owners with interests in the Property prior to the commencement of this action.

Ms. Logan testified that she had been aware of the Property since she first met Mr. Logan in 1978 when he told her that he owned the Disputed Interest and they "would ride up that way and look at the property just out riding around . . . talk[ing] about what hopefully would be developed some day." Ms. Logan stated that at that time, the Property was vacant except for the Hughes family's cattle grazing on it and that Mr. Logan had a key to a locked gate located on the Property. It was her understanding that the Hughes family used the Property with Mr. Logan's permission. Ms. Logan also testified that following their 1980 marriage, Mr. Logan would occasionally go to the

Property without her and would tell her about his visits there. Ms. Logan stated that she had known Mr. Cannon and that he would often join her and her husband at their table when they ate at a restaurant that had been located near the Property. She described Mr. Cannon's "always ask[ing] what was going on with the property" and what Mr. Logan was "going to do with the Property."

Ms. Logan described one occasion when a lock was on the gate to which Mr. Logan did not have a key. According to Ms. Logan, she and Mr. Logan immediately drove to a hardware store to buy bolt cutters and then returned to the Property so that Mr. Logan could cut and remove the lock. She described another occasion when the gate and fence had fallen over, stating that Mr. Logan had the damage repaired. Ms. Logan further testified that Mr. Logan and she had bought "no trespassing" signs at one point and that she was with Mr. Logan when he posted those signs. She acknowledged that the "no trespassing" signs did not indicate who owned the Property. Ms. Logan stated that she had visited the Hughes residence and that she had been present on occasion when Mr. Logan had given Mr. Hughes instructions concerning "clipping" the Property. Ms. Logan also stated that over the years, she had been aware of potential buyers' expressing interest in purchasing the Property, including Pilot Oil and Love's, and that she did not know of anyone other than Mr. Logan who had spoken to potential buyers or was authorized to show the Property.

During trial, Mr. Logan read excerpts of deposition testimony into the record that the parties had stipulated to as representative of the testimony that certain individuals would have given. These individuals included Darlene D. Felker, Mr. Logan's personal secretary and legal assistant since 1994; Sandra Evilsizer, successor in title to her husband as a tenant in common owning one-quarter interest in the Property; Jenny Rogers, successor in title to her father as a tenant in common owning one-quarter interest in the Property; and Amy Conley Moore, who had been employed in the Bradley County planning office from 1998 to 2004. Mr. Logan also read into the record, without objection, an excerpt from an affidavit executed by Janet Kibler, sister to Mr. Finnell and long-time legal secretary and bookkeeper in Mr. Logan's law firm.

In general, the deposition testimony from these individuals and Ms. Kibler's affidavit corroborated Mr. Logan's claim that he had been perceived in the community since 1974 to be the owner of the Disputed Interest. In her affidavit, Ms. Kibler stated regarding this issue: "Since the mid-1970s, Logan has been the person who has been the contact person regarding the use of the property. His possession of the one-fourth interest has been open and known by anyone who would call or communicate regarding the property."

13

Ms. Felker testified in her deposition that it had been her understanding while employed at Logan-Thompson that Mr. Logan had purchased the Disputed Interest from Sam Cannon in 1974. She stated that within the first year she was employed at the firm, she would write the checks to pay the property taxes on the Property and that Mr. Logan would then sign the checks out of his account. According to Ms. Felker, she gathered together the property tax payments for the various co-owners, first for Mr. Logan and Mr. Thompson internally to be sent in with Mr. Finnell's to the assessor's office, and then after Mr. Finnell's death, for all of the interest-holders in Logan-Thompson, along with Jenny Rogers's one-quarter payment. Ms. Felker further testified that she had seen photographs of the Property and that on several occasions while she was employed with the firm, Mr. Logan told her that he was "going out to the property to check on things, going out there to take pictures . . . going out there to meet with folks." She stated that she heard Mr. Logan say on one occasion that he was meeting someone from Pilot to look at the Property. Ms. Felker acknowledged that she had never been to the Property and that the picture-taking had occurred after the instant litigation began.

Jenny Rogers testified that as Mr. Finnell's daughter, she inherited one-quarter interest in the Property through her father's estate.[2] She stated that her understanding was that the other co-owners of the Property were "Jim Logan, Jim Thompson and the Wrights." She also stated that prior to this lawsuit, she had not been aware that Sam and Mildred Cannon had owned an interest in the Property. Jenny Rogers further testified that she had only been to the Property once when her parents took her to visit the Property on the way to Knoxville because her father wanted the family to see it. According to Jenny Rogers, Mr. Finnell told her at the time that "the two Jims [Thompson and Logan] were partners" in the ownership of the Property. Jenny Rogers also testified that she had no knowledge of any individual other than Mr. Logan who controlled the use and maintenance of the Property. She acknowledged that she had never observed Mr. Logan on the Property and had no knowledge of how the Property had been utilized.

Ms. Evilsizer testified in her deposition that she inherited a one-quarter interest in the Property when her husband, Bill Wright, who had been in business with Mr. Cannon, passed away in 1994. She explained that her husband and Mr. Cannon had initially purchased the Property in approximately 1968. According to Ms. Evilsizer, the Property at that time already had "some fencing on it." Ms. Evilsizer stated that Bill Wright and she subsequently relocated to Virginia and then moved back to Bradley County in 1977. She testified that before they moved to Virginia, she had walked on the Property a "couple" of times and that after returning in 1977, she had driven by the Property "many

---

[2] The facts of this case require that in some instances, we refer to more than one person with the same surname. For clarity and ease of reference, we will sometimes use individuals' full names throughout this opinion. No disrespect is intended.

times" and "sort of watched all the growth around there."  Ms. Evilsizer also testified that "H. L. Hughes had some livestock grazing on" the Property but that she did not know if anyone mowed or maintained the Property.  Ms. Evilsizer knew of no arrangement between Mr. Hughes and Bill Wright.  She acknowledged that she had never observed Mr. Logan on the Property.  She stated, however, that although she could not remember the year, at one point her husband had told her that Mr. Cannon had sold his interest in the Property to Mr. Logan.

Ms. Evilsizer described an incident occurring in 1995 or 1996 that illustrated her understanding that Mr. Logan controlled access to the Property at least to some extent.  Concerning this incident, she testified as follows:

> [I]t was the Sunday after Thanksgiving and it was either '95 or '96.  [Ms. Evilsizer's daughter] and her friend . . . were living together in Knoxville going to school so I know it was one of those two years because those were the two years they lived together.
>
> And they left Cleveland and went up to that property.  And they were poor college students so – [Ms. Evilsizer's daughter] had been to that property many times with her father to get Christmas trees.  She always wanted a Christmas tree in her room by herself.  I mean, her own room.  So they got little cedar trees.
>
> So they got this bright idea that they were going there and get them a Christmas tree.  I don't know how -- well, they got one so I'm assuming they were in the process of sawing one down.
>
> And Mr. H. L. Hughes -- and that's who she said it was -- came up to them and wanted to know what they were doing.  And she said that she was cutting down a Christmas tree.  And he wanted to, you know, know why and she said, well, my daddy owns this property.  Of course, her daddy was dead but -- but anyway.  And -- or he owned part of it.  I'm not sure what her verbiage was.
>
> And he [Mr. Hughes] was rather upset with them because they had left a fence, a gate -- however they got in, they had left a gate open.  And she said, what are you doing here. . . .  And he said, well -- and told her who he was and that I have -- I don't know if he said cattle, horses, livestock. . . .

15

Anyway, he had animals grazing on the property and that . . . he had arrangements with Mr. Jimmy Logan to do that. Okay. So they get their Christmas tree and they put it on top of their car. They go to Knoxville and she gives me a call.

So the next week I went down to Mr. Jimmy Logan's office and said, what's going on. And I was told H. L. Hughes had been given permission to graze his animals on that property. Which didn't bother me, you know.

Ms. Evilsizer confirmed that she had never participated in the management of the Property, stating that she believed she "had three partners who were all lawyers who had staff, who had people that could help with things like that."

Ms. Moore testified that she had discussed the Property with Mr. Logan when she was employed in the county planning office from 1998 to 2004. She stated that at the time, Mr. Logan was the county attorney and that they were working on zoning issues. According to Ms. Moore, after an applicable zoning ordinance had been enacted in December 1999, Mr. Logan came to her office because "he wanted to get the process started to get a rezoning on the [P]roperty." She stated that she did not know whether a formal rezoning application regarding the Property had ever been submitted. Ms. Moore testified that Mr. Logan had represented the Property as vacant and had told her his plans to build the first liquor store in Bradley County on the Property. Ms. Moore acknowledged that she had never visited the Property and had never independently investigated who owned it.

Evidence presented by Defendants included, in addition to various exhibits, testimony proffered by Bradley County Property Assessor Stanley Thompson ("Assessor Thompson"); Mildred Cannon's sister, Judy Bennett Rogers ("Judy Rogers"); and co-defendant Janna Cannon Sullivan. Assessor Thompson testified that at the time of trial, the Property was assessed as vacant land with no improvements and that from 1999 through 2008, the assessed property owners were Conrad Finnell, James Thompson, Sam Cannon, and C.W. Wright, Jr. He stated that he had reviewed the records concerning the Property and did not find any evidence that the Property was assessed to Mr. Logan prior to 2008.

Assessor Thompson further testified that when a quitclaim deed was recorded in 2008, transferring any interest in the Property that may have been held by Yvonne Cannon to Mr. Logan, the assessor's office staff assumed that because Yvonne Cannon was the widow of Sam Cannon, she had interest in the Property to transfer to Mr. Logan. Assessor Thompson acknowledged that his office had not conducted a title search at that

time. He also acknowledged that at the time of trial, Mr. Logan did not hold title to the Disputed Interest. Assessor Thompson stated that an individual researching ownership of the Property online would only see Mr. Wright's name because his name would appear first and would also be the first to appear on a tax assessment of the Property. He explained that an individual would have to visit the assessor's office to examine the status of all title holders to the Property.

Judy Rogers testified that she had become aware of the Property in 2008 when her sister, Mildred Cannon, showed the Property to her. Judy Rogers stated that in 2008, Mildred Cannon had "the deed so I assumed it was her property." According to Judy Rogers, when she saw the Property in 2008, it was vacant with "some trees, some grass." She stated that she had seen no signs on the Property or any other indication of ownership and that she did not remember if she had seen any fencing. Judy Rogers further testified that Mildred Cannon had telephoned her after Mr. Botts brought a deed to Mildred Cannon's house, requesting that it be executed. Judy Rogers confirmed that Mildred Cannon did not execute the deed that had been brought to her by Mr. Botts.

Ms. Sullivan testified that she initially became aware of the Property in 2008 when her mother, Mildred Cannon, had been contacted by Mr. Logan and Mr. Botts to execute a deed conveying the Disputed Interest to Mr. Logan. Ms. Sullivan also testified that she visited the Property in 2008 and observed "[p]asture, fallen trees, a fence line that [had] trees growing over it." According to Ms. Sullivan, there were no signs of any kind and no indication of ownership on the Property in 2008. Ms. Sullivan further testified that once she became aware of the Property, she attempted to pay the property taxes on the Disputed Interest but was not allowed to by the assessor's office because by that time, the quitclaim deed purporting to convey Yvonne Cannon's interest in the Property to Mr. Logan had been recorded. Ms. Sullivan stated that she was told by the assessor's office that the litigation would have to be resolved to "straighten this out."

Ms. Sullivan also reviewed photographs she had taken of the Property recently, noting that by her observations, the fence was not visible from many spots on Mouse Creek Valley Road. Ms. Sullivan stated that she had driven by the Property periodically since 2008 and that she had never observed cattle grazing on the Property or Mr. Logan on the Property. She acknowledged that she had never gone beyond the fence to physically access the Property.

In an order entered October 17, 2018, with an incorporated memorandum opinion, the trial court dismissed Mr. Logan's claim upon finding that he had failed to prove common law adverse possession of the Disputed Interest by clear and convincing evidence. *See Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 377 (Tenn. 2007) ("The burden of proof is on the individual claiming ownership by adverse possession and the

quality of evidence must be clear and convincing."). The trial court in its final order also incorporated "Supplemental Findings of Fact and Conclusions of Law," clarifying its findings and conclusions regarding the fence on the Property. Mr. Logan timely appealed.

## II. Issues Presented

Mr. Logan presents one issue on appeal, which we have restated as follows:

1. Whether the trial court erred by declining to find that Mr. Logan was the owner of the Disputed Interest through common law adverse possession.

Defendants present an additional issue, which we have similarly restated as follows:

2. Whether this appeal is frivolous pursuant to Tennessee Code Annotated § 27-1-122.

## III. Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). We review the trial court's conclusions of law *de novo* with no presumption of correctness. *Hughes v. Metro. Gov't of Nashville & Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

## IV. Common Law Adverse Possession

Mr. Logan contends that the trial court erred by declining to find that he was the owner of the Disputed Interest through common law adverse possession. He argues that the trial court erred in finding that the evidence only preponderated in favor of adverse possession and did not also rise to the requisite clear and convincing evidence standard. Mr. Logan specifically posits that the trial court improperly relied on the unavailability of

deceased witnesses to testify, namely Sam Cannon and Mildred Cannon, and the absence of any written documentation of the alleged sale conveying the Disputed Interest from Sam and Mildred Cannon to Mr. Logan. In response, Defendants contend that the trial court properly found that Mr. Logan had failed to demonstrate clear and convincing evidence of adverse possession because his use of the Property was neither actual and continuous nor so open and notorious for at least twenty years so as to put Defendants on notice of his claim. Although acknowledging that the trial court credited Mr. Logan's testimony that he had paid real property taxes on the Disputed Interest for approximately thirty years, Defendants assert that such payment of taxes does not constitute evidence of adverse possession. Upon careful review of the record and applicable authorities, we conclude that Mr. Logan demonstrated clear and convincing evidence of common law adverse possession of the Disputed Interest in the Property.

Acquisition of property by adverse possession may operate as a bar to recovery of the property by the title holder, and it may also operate to vest the adverse possessor with title. *See Cumulus Broad.*, 226 S.W.3d at 375; *Wilson v. Price,* 195 S.W.3d 661, 666-67 (Tenn. Ct. App. 2005). As our Supreme Court has explained regarding common law adverse possession:

> In our state, common law adverse possession rests upon the proposition "that, where one has remained in uninterrupted and continuous possession of land for 20 years, a grant or deed will be presumed." Color (or assurance) of title is not required. In order to establish adverse possession under this theory, or in any statutorily based claim, the possession must have been exclusive, actual, adverse, continuous, open, and notorious for the requisite period of time. Adverse possession is, of course, a question of fact. The burden of proof is on the individual claiming ownership by adverse possession and the quality of evidence must be clear and convincing. The actual owner must either have knowledge of the adverse possession, or the possession must be so open and notorious to imply a knowledge of the adverse possession, or the possession must be so open and notorious to imply a presumption of that fact. When an adverse possessor holds the land for a period of twenty years, even absent any assurance or color of title, the title vests in that possessor.

*Cumulus Broad.*, 226 S.W.3d at 376-77 (internal citations omitted).[3]

---

[3] As noted in *Logan I*, statutory provisions regarding adverse possession in Tennessee, *see* Tenn. Code Ann. §§ 28-2-101 to -103 (2017), in contrast to common law adverse possession, "provide rights that 'may be utilized by the adverse holder only in the defense of a suit and not as a means to bar use by the rightful owner.'" *Logan I,* 2016 WL 5344526, at *10 n.5 (quoting *Cumulus Broad.*, 226 S.W.3d at 376)).

19

Concerning the clear and convincing evidence standard, our Supreme Court has elucidated:

> The "clear and convincing" standard falls somewhere between the "preponderance of the evidence" in civil cases and the "beyond a reasonable doubt" standard in criminal proceedings. To be "clear and convincing," the evidence must "produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Hobson v. Eaton*, 19 Ohio Misc. 29, 399 F.2d 781, 784 n.2 (6th Cir. 1968), *cert. denied*, 394 U.S. 928, 89 S. Ct. 1189, 22 L. Ed. 2d 459 (1969). "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). *See e.g. In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. App. 1993).

*Walton v. Young*, 950 S.W.2d 956, 960 (Tenn. 1997) (quoting *Fruge v. Doe*, 952 S.W.2d 408, 412 n.2 (Tenn. 1997)).

In its memorandum opinion incorporated into the final judgment, the trial court began its analysis by finding that it had no reason to question the credibility of any of the witnesses. However, the trial court also found that because Sam and Mildred Cannon were deceased, the court had been unable to hear their side of the story, stating: "We don't know what [Sam and Mildred Cannon] had to say because of the time that has elapsed from 1974 up until today." The court noted that the lack of a deed conveying the Disputed Interest to Mr. Logan had apparently been caused by an "incredible string of errors" that could not now be remedied. Although crediting Mr. Logan's testimony that he had paid taxes on the Disputed Interest for approximately thirty years, the trial court found that the Cannons' names had nonetheless remained on the deed and that "the trustee, when they take payment of taxes they don't care who pays the taxes."

Specifically as to adverse possession, the trial court found in pertinent part:

> [T]his is obviously a piece of land enclosed in such a way that it would've been possible for Mr. Logan to have done everything he said, every single thing.
>
> And still the Cannons might not have known about it. Had actual knowledge about it unless it is exactly as he said and that is that he and Mr. Cannon shook hands on it and that he agreed that Mr. Cannon would give

him a deed at some future date, the money having already . . . exchanged hands.

And so it's hard. It's hard. You look at that land out there. The fence goes back to the late 1960s at least and it wasn't put up for the purpose of giving notice that somebody was claiming the land adversely. It was land put up to hold cattle of all things. It wasn't even—it might have been on the line in some places.

I never did actually hear about that exactly. I assume it's close to the line most everywhere but it was there primarily to hold cattle. And even though it's been updated and in some places replaced and in some places moved a short distance especially when the road was built or widened. It's never been anything other than a cattle fence.

So what is there about that enclosure. What is there about that enclosure that is calculated to say to the whole world, hey, this is mine. I'm here. I'm in possession and you're not and this is mine and I'm in and you're out and if you want it you're going to have to take it from me. What is it about that when it's just a cattle fence. And it's a pasture land that was maintained as pasture. There was cattle running on it.

* * *

It would've been possible even though Mr. Logan and his witnesses, his wife who's sitting in the back of the courtroom here, went by let's say frequently. They went by often when they were out in that direction. They weren't on the property. Their possession was not actual in the sense that they were in there somehow. On it visibly, occupying it or doing things on it other than there was some cattle on it.

So that it would've been possible for anybody else—except Mr. Logan's group of friends and the neighbors there that he dealt with on a regular basis, it would've been possible for somebody else driving by to have passed by and never seen Mr. Logan, never seen Mr. Hughes. Who could say? Who could say?

And so I've been sitting up here thinking, well, he says he was out there often. Is that good enough? Is that good enough when it's a fence that was there from the late 1960s and except for the fact it's been updated and maintained, there's nothing more than that. . . .

21

Again, it's plausible.  Everything Mr. Logan says is plausible. Everything Mr. Logan says one could find—if the test was preponderance of the evidence everything that Mr. Logan has said one could find by a preponderance of the evidence.  And the question is whether or not it crosses the line to clear and convincing evidence.  Does it?  It must be exclusive.  And I don't find that anybody other than Mr. Logan, on behalf of his three other owners of the one-quarter interest each, was ever out there so it would have been exclusive.

* * *

Here there was actual possession of something by someone in the sense that it was pasture land with cattle on it and it was grass with some trees.  It must be adverse. . . .

Adverse as if someone is claiming something that they know somebody else is also claiming.  Adverse in the sense that I'm at war with these people over here.  Even though I may be wrong I'm still at odds with them.

But Mr. Logan didn't even know that he was at odds with anybody and yet the law relative to adverse possession requires that his occupancy, his possession to be adverse to somebody.  And his mere presence out there, or Mr. Hughes' presence at Mr. Logan's permission, could have been adverse just by the very nature of the thing and continuous.  And I would say it's continuous whatever—if that is adverse—if that fence and that use is adverse then it was continuous.

It wasn't open in the sense that it was used for pasture land and cattle and had some trees on it and notorious in the sense that it was making a claim, a statement.  Not just that he was in possession but he was making a statement by his occupancy of the land for the requisite period of time which would've been, in this case, twenty years since there's no deed.

* * *

I think probably that there were a lot of people who knew Mr. Logan was claiming the property.  He's named off the people up and down the road there in that community in addition to his co-owners, in addition to the property assessor perhaps.

22

But even the property assessor now has undone his addition of Mr. Logan's name to the list of those who owned the property because he has examined the deed from Yvonne Cannon and decided that there was nothing there for her to convey and therefore he should not have added Mr. Logan's name to the list.

Gentlemen, if I'm going to do what the Appellate Courts, including the Supreme Court, have said in the past that I should do in cases of adverse possession insofar as the elements of proof are concerned, and I have some examples that have been given to me of cases where these issues have been decided in the past, then I'm going to have to question whether or not some of these elements have been met in this case.

Namely, whether or not the possession was adverse and notorious to someone in the position say of Mildred Cannon and perhaps others who did not know anything about what was going on there. But it's pertinent only to them because they're the other people involved.

And there's another thing and that is the degree of proof . . . .

[E]ven though I have some question about one or more of these elements of adverse possession up here there was also the issue of the convincing effect. Is that sufficient to take it over to clear and convincing proof when especially I feel like I haven't been able to hear all that I should have heard in order to be able to have any sort of peace about a decision in this matter.

And so I would have to find—I'm going to find that the evidence preponderates in favor of Mr. Logan but that it does not carry the weight of clear and convincing evidence that would be the threshold that Mr. Logan would have to cross in order to prevail in this lawsuit.

And I do that so reluctantly with such an uneasy feeling in my gut that Mr. Logan may be losing a case that he should not have lost simply because of this string of errors that has occurred here.

In its supplemental ruling, the trial court clarified its findings and conclusions regarding the fence on the Property as follows in relevant part:

The fence does not support Logan's claim to have satisfied any of the elements required for establishing title by Adverse Possession. It was constructed before any of the present parties acquired their respective

23

interests in the Disputed Tract, before they ever received any deed, and before they took possession. A prior owner constructed the fence for the purpose of controlling the movement of livestock. At all times relevant hereto, the fence was used for the purpose of controlling livestock or for enclosing the hay field on the Disputed Tract. Over the years relevant to this case, the fence was regularly maintained by the person using the land for agricultural purposes, and was partially relocated to allow for the construction or expansion of a road along one side of the Disputed Tract. But the fence was not constructed or maintained by Logan for the purpose of making some statement or giving notice that he was claiming the Disputed Tract adversely to the interests of the Cannons. Insofar as the fence is concerned, nothing was done by Logan or the other Plaintiffs to demonstrate that they were holding adversely, notoriously, exclusively, or continuously for the statutory period. The most that Logan can say is that the fence was in existence, that it was visible to the public, and that he had a key to the gate which was inspected by him periodically. All of the Plaintiffs, except Logan, acquired their interests in the Disputed Tract by deed, and even Logan thought that he had a deed. So, why would he need more than a deed? Until this lawsuit, Logan was making no claim to the property by Adverse Possession. He now relies upon the theory of Adverse Possession because of mistakes made by him or others acting on his behalf to secure some muniment of title that would satisfy the Statute of Frauds. The Court cannot find that Logan ever thought of the fence as a way to acquire an interest in the Disputed Tract by Adverse Possession. Because the fence was constructed before the parties acquired their respective interests in the Disputed Tract, and because the basic use and appearance of the Disputed Tract never changed during the relevant time period, it is accurate to say that the Disputed Tract was in its natural condition throughout the period during which Plaintiffs, including Logan, held or claimed their respective interests. Except for those in the immediate area around the Disputed Trac[t], or those having personal contact with Logan, it would have been entirely possible for others, including the Cannons, to look at the Disputed Tract and see nothing more than the condition that it had always had from before the parties acquired any of the respective interests.

On appeal, Defendants primarily argue that the trial court properly found that Mr. Logan had failed to present clear and convincing evidence that his use of the Property was "sufficiently actual, continuous, adverse, open visible and notorious so as [to] give [Defendants] knowledge of his claim." We disagree. As noted in *Logan I*, "the twenty-year period prior to commencement of the instant action began in February 1991." *See*

*Logan* I, 2016 WL 5344526, at *10. As to Defendants' actual knowledge of Mr. Logan's claim, although testimony differed as to whether Mildred Cannon had at one point stated that she remembered the purported sale of the Disputed Interest to Mr. Logan, it is undisputed that Mildred Cannon's daughter, Ms. Sullivan, was not aware of the Property's existence until 2008 and certainly had no actual knowledge of Mr. Logan's control over and use of the Property until that time at the earliest.[4] We discern no error in the trial court's finding that Defendants did not have actual knowledge of Mr. Logan's control over and use of the Disputed Interest for the requisite twenty years.

In order to prove common law adverse possession, Mr. Logan must therefore have presented clear and convincing evidence that his control over and use of the Disputed Interest was so open and notorious as to imply knowledge of his adverse possession or at least to imply a presumption of that fact. *See Cumulus Broad.*, 226 S.W.3d at 377. Upon careful consideration, we determine that he has done so. The trial court credited Mr. Logan's testimony and the testimony of other witnesses who stated that Mr. Logan had exercised a consistent level of control over the Property—acting as the contact person for permission to access the Property, initiating repairs to the fence and gate, and discussing the Property with potential buyers—since the mid-1970s, well before the required twenty-year period began. The trial court also found that Mr. Logan's control over the Property was exclusive in that while he never held himself out as the owner of any more than a one-quarter interest, Mr. Logan was the only individual managing the Property for owners of the remaining three-quarters interest.

It is possible that Mr. Logan could have performed these functions on the Property simply as an agent for the co-owners, particularly those in his law firm, but that is not what the testimony of co-owners Mr. Thompson, Jenny Rogers, and Ms. Evilsizer indicates. Each testified that he or she considered Mr. Logan the owner of the Disputed Interest, and Mr. Thompson testified that Mr. Logan had taken over management and control of the Property from the time of the alleged $6,400.00 payment to Sam and Mildred Cannon in 1974. Ms. Evilsizer, who testified that she had not participated in the

---

[4] In *Logan I*, this Court determined that, contrary to the trial court's initial finding, statements made by Mr. Botts in an affidavit that constituted his personal observations would be admissible as testimony during trial. *Logan I*, 2016 WL 5344526, at *6. Within the factual and procedural background section of their responsive brief in the instant appeal, Defendants assert that they "renew all objection as to the consideration" of testimony presented by Mr. Botts concerning, *inter alia*, what he claimed to have overheard Mildred Cannon say during a speakerphone conversation with Mr. Logan. Defendants have not, however, raised the issue of admissibility of Mr. Botts's testimony as an issue in their statement of the issues. We therefore determine that in this appeal, Defendants have waived any issue concerning admissibility of testimony. *See Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012) ("Appellate review is generally limited to the issues that have been presented for review." (citing Tenn. R. App. P. 13(b)) *Champion v. CLC of Dyersburg, LLC*, 359 S.W.3d 161, 163 (Tenn. Ct. App. 2011) ("An issue not raised in an appellant's statement of the issues may be considered waived.").

management of the Property at all since inheriting her interest from her deceased husband, also testified that her daughter had encountered Mr. Hughes when attempting to cut a Christmas tree on the Property and had been referred by him to Mr. Logan as the owner of the Property who could give permission for access.

We note that Defendants were not required to use the Property in order to retain title to it. *See Hollow v. Butler*, No. E2010-02150-COA-R3-CV, 2011 WL 3062021, at *9 (Tenn. Ct. App. July 26, 2011) (explaining that the burden to prove adverse possession is on the party claiming adverse possession and that the title holders to the property at issue "had the right to use, or not use, their property as they saw fit."). However, in terms of an implication of knowledge of Mr. Logan's alleged adverse possession, if Defendants had attempted to use the Property in any way, which they apparently did not, the totality of the evidence demonstrates that they would have had to obtain a key to the locked gate on the Property from either Mr. Logan or Mr. Hughes, who himself testified that he believed his use of the Property was with the permission of Mr. Logan as owner. The trial court also credited the testimony of witnesses, including Mr. Logan, Ms. Logan, and Ms. Felker, who stated that Mr. Logan had consistently been the contact person for potential buyers interested in the Property.

In finding that the evidence did not rise to the level of clear and convincing, the trial court in its memorandum opinion relied in part on this Court's decision in *Hollow*, 2011 WL 3062021, a boundary line dispute in which this Court affirmed the trial court's determination, *inter alia*, that the defendant had failed to prove the affirmative defense of adverse possession. Upon review, we determine *Hollow* to be factually distinguishable from the instant action. This Court in *Hollow* summarized the defendant's evidence presented in an attempt to show adverse possession as "one instance of cutting timber, occasional straying of cows into the Disputed Area, and occasional use by neighbors for cutting firewood or hunting." 2011 WL 3062021, at *10.

As in the instant action, the record in *Hollow* did not indicate any actual knowledge on the plaintiffs' part concerning the adverse possession asserted by the defendant. *Id.* This Court therefore stated that the defendant would have "to show by clear and convincing evidence that her alleged possession of the Disputed Area was so open and notorious as to imply a presumption of the fact." *Id.* In determining that the defendant had failed in this respect, the *Hollow* Court concluded that the presence of the defendant's cattle on the disputed property constituted only "occasional straying," that the plaintiffs would have been justified in thinking that any repairs made to the fencing by the defendant had actually been made by the plaintiffs' lessees, and that other property owners had often been the ones to give permission to neighbors to cut firewood or hunt. *See id.* at *10; *see also Cusick v. Cutshaw*, 237 S.W.2d 563, 567 (Tenn. Ct. App. 1948)

("Occasional use of land through cultivation, cutting grass or timber or the grazing of stock is not sufficient to establish adverse possession.").

In contrast, the evidence demonstrates in this action that Mr. Hughes, as well as his father before him, consistently grazed twenty to thirty head of cattle on sixty acres of land that included the 7.18-acre parcel at issue here. Other than Ms. Sullivan's statement that she had not seen cattle when visiting the Property and Judy Rogers's statement that she had only observed "some trees, some grass" in her one visit to the Property, those witnesses who had been to the Property stated that they had observed cattle grazing there and the fence designed to contain them. This use of the Property had been ongoing rather than occasional, and the cattle's owner, Mr. Hughes, testified that since well before the requisite twenty-year period, he had looked to Mr. Logan as the person in control of whether his cattle were allowed to graze on the Property. The evidence is clear and convincing that if Defendants had investigated who controlled the Disputed Interest in the Property at all during the twenty years prior to the filing of this action, they would have discovered that it was Mr. Logan. *See Walton*, 950 S.W.2d at 960 ("Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." (quoting *Fruge v. Doe*, 952 S.W.2d 408, 412 n.2 (Tenn. 1997))).

As to the fence on the Property, the trial court found that the fence's presence was not indicative of Mr. Logan's adverse possession because the original fence was already there when the current co-owners purchased the Property, "the fence was regularly maintained by the person using the land for agricultural purposes, and [the fence] was partially relocated to allow for the construction or expansion of a road along one side of the Disputed Tract." However, as with the grazing of the cattle, Mr. Hughes testified that he regularly followed Mr. Logan's instructions concerning the maintenance of the fence and gate and viewed Mr. Logan as the individual who could grant permission for a lock on the gate to be changed. Likewise, testimony indicated that although the Wrights had built the newer fence on the Property, Mr. Logan had been consulted in advance by the Wrights and had granted permission for the new fence.

The trial court also based its findings concerning the fence in part on the undisputed fact that Mr. Logan did not know until 2006 or 2007 that he did not hold title to the Disputed Property. The trial court found that "the fence was not constructed or maintained by Logan for the purpose of making some statement or giving notice that he was claiming the Disputed Tract adversely to the interests of the Cannons." The trial court also found that Mr. Logan never "thought of the fence as a way to acquire an interest in the Disputed Tract by Adverse Possession."

27

In general, the trial court found that Mr. Logan had failed to show possession that was "[a]dverse as if someone is claiming something that they know somebody else is also claiming. Adverse in the sense that I'm at war with these people over here." The flaw in this rationale is that an intent to adversely possess against another is not required to establish adverse possession. *See Cumulus Broad.*, 226 S.W.3d at 378 ("[A]ctual intent to possess adversely is not a prerequisite to a finding of adverse possession." (citing *Lemm v. Adams*, 955 S.W.2d 70, 72 (Tenn. Ct. App. 1997)). As this Court has explained:

> Unlike its general usage, hostility for the purposes of adverse possession does not require ill will. "Hostility" exists, in the legal sense, when one "holds the possession as his, against the claims of any other." *Hightower v. Pendergrass*, 662 S.W.2d 932, 937 (Tenn. 1983). Moreover, the hostile possession must be open such that it provides notice to the world that the adverse possessor claims ownership of that property. *Cooke v. Smith*, 721 S.W.2d 251, 254 (Tenn. Ct. App. 1986). Although fencing a property demonstrates a clear claim of ownership, inclosure is not necessary to demonstrate possession. *Bensdorff v. Uihlein*, 132 Tenn. 193, 177 S.W. 481, 482 (1915). Rather, the possessor must use the property in a manner consistent with its nature and purpose and in such a way as to give notice to the rightful owner that another is asserting dominion over his property. *Id.* at 483.

> Additionally, a party is not required to harbor the intent to possess another's land in order to invoke the doctrine of adverse possession. *Liberto v. Steele*, 188 Tenn. 529, 221 S.W.2d 701, 703 (1949). "The possession, use, and dominion may be as absolute and exclusive where there is no dispute as to boundary, and hence the occupant has no actual intention to claim adversely to anyone, as where such an intention exists." *Gibson v. Shular*, 29 Tenn. App. 166, 194 S.W.2d 865, 867 (1946).

*Wilson*, 195 S.W.3d at 667-68. We determine that the trial court improperly considered a lack of intent to adversely possess specifically against the titled owners on Mr. Logan's part.

Upon careful consideration, we also agree with Mr. Logan that the trial court improperly gave weight to its inability to hear what Mildred Cannon or Sam Cannon's testimony would have been concerning the alleged 1974 sale of the Disputed Interest and improperly considered what the court found to be the "incredible string of errors" that led to the absence of documentation of that alleged sale. Such testimony and documentation, if presented, would have gone toward proving color of title on Mr. Logan's part, which is an element of statutory adverse possession under the affirmative defense provided by

Tennessee Code Annotated § 28-2-102 (2017). However, color of title is not a required element of common law adverse possession. *See Cumulus Broad.*, 226 S.W.3d at 376-77; *Michael v. Jakes*, No. M1999-02257-COA-R3-CV, 2002 WL 1484448, at *6 (Tenn. Ct. App. July 12, 2002) ("[T]itle by common law prescription or adverse possession does not require color of title and is not based upon an assertion of title by legal writing or anything other than possession for the requisite time and under the requisite circumstances.").

Defendants also argue that "[e]ven if Logan paid a share of property taxes for several years leading up to the litigation, it does not establish a claim of adverse possession." Bradley County tax records attached to an affidavit executed by the county trustee undisputedly reflected that Mr. Logan had paid one-quarter of the taxes for the Property from 1996 through 2010. Testimony from Mr. Logan and Ms. Felker particularly supported Mr. Logan's assertion that he had also paid property taxes on the Disputed Interest from his alleged 1974 purchase through 1996, although tax receipts for these years indicated merely that the taxes had been paid.

Concerning property taxes, the trial court specifically found in relevant part:

And so for all of these years, from 1974, '84, '94, 2004 past that for 30 plus years the taxes were apparently paid by Mr. Logan and the others without there ever having been any notice taken of the fact that the Cannons' name[s were] still listed by the property assessor as being among the owners.

In so finding, the trial court expressly credited testimony that Mr. Logan had paid his one-quarter share of the taxes on the Property. We discern no reason to disturb the credibility determinations within this finding. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) ("[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.").

The trial court did not find Mr. Logan's payment of property taxes to be significant in terms of his claim of adverse possession. We agree with the trial court and with Defendants that such payment of property taxes does not establish adverse possession. *See Bone v. Loggins*, 652 S.W.2d 758, 760 (Tenn. Ct. App. 1982) ("[E]ven assuming that the appellants did pay the taxes, payment of taxes merely shows an intention to claim the land, it is not evidence of adverse possession."). However, we do find the evidence concerning Mr. Logan's payment of property taxes on the Disputed Interest to be probative of his longtime intent to possess the Disputed Interest, *see id.*, and to a lesser degree, the manner in which Mr. Logan generally conducted himself within the community as the owner of the Disputed Interest. We note that it is undisputed that

29

between 1974 and 2008, Defendants had made no attempt to pay the property tax on the Disputed Interest.

As the trial court indicated in its memorandum opinion, the facts in this action present a close case. However, given the totality of the record, we determine that Mr. Logan presented clear and convincing evidence that his possession of the Disputed Interest in the Property was exclusive, actual, adverse, and continuous and was so open and notorious as to imply knowledge of his adverse possession or at least to imply a presumption of that fact. *See Cumulus Broad.*, 226 S.W.3d at 377. Mr. Logan has established ownership of the Disputed Interest by common law adverse possession. *See, e.g.*, *Wilson*, 195 S.W.3d at 670 (determining that the plaintiff's presentation of clear and convincing evidence of adverse possession as to a strip of property at issue established the plaintiff's ownership of that strip). We therefore reverse the trial court's dismissal of Mr. Logan's common law adverse possession claim.

## V. Frivolous Appeal

Contending that this is a frivolous appeal, Defendants request "damages" on appeal. Tennessee Code Annotated § 27-1-122 (2017) provides:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

We determine that this appeal was not frivolous or taken solely for delay, particularly considering Mr. Logan's success on appeal. *See Young v. Barrow*, 130 S.W.3d 59, 67 (Tenn. Ct. App. 2003) ("A frivolous appeal is one that is devoid of merit or one that has no reasonable chance of succeeding.") (internal citation omitted). Accordingly, Defendants' request for damages on appeal is denied.

## VI. Conclusion

For the reasons stated above, we reverse the trial court's judgment dismissing Mr. Logan's claim of adverse possession as to the Disputed Interest in the Property. Defendants' request for an award of attorney's fees on appeal is denied. This case is remanded to the trial court for entry of a judgment granting ownership of the Disputed Interest to Mr. Logan and for collection of costs below. Costs on appeal are taxed to the appellees: the Estate of Mildred Cannon by and through the Personal Representative,

30

Janna Sullivan; Janna Cannon Sullivan, Individually; Janna Cannon Sullivan as Co-Trustee; and Comerica Bank, Successor Co-Trustee.

_____
THOMAS R. FRIERSON, II, JUDGE

31